No. 98,727

STATE OF KANSAS, *Appellant*, v. RYAN MICHAEL SCHULTZ,
*Appellee*.
(212 P.3d 150)

Opinion filed July 24, 2009.

*Jamie L. Karasek*, assistant district attorney, argued the cause, and *Robert D. Hecht*, district attorney, *Paul J. Morrison*, former attorney general, and *Steve Six*, attorney general, were with him on the briefs for appellant.

*Thomas G. Lemon*, of Cavanaugh & Lemon, P.A., of Topeka, argued the cause and was on the briefs for appellee.

The opinion of the court was delivered by

BEIER, J.: This is an appeal filed by the State from the district court's suppression ruling in favor of defendant Ryan Michael Schultz. On petition for review from a Court of Appeals' decision affirming the district court in *State v. Schultz*, No. 98,727, unpublished opinion filed March 14, 2008, we must decide whether

Schultz was subjected to a custodial interrogation while in his own apartment and, if so, whether statements made and physical evidence discovered as a result of that interrogation must be excluded.

### Factual and Procedural Background

This case began when a pest control worker observed marijuana in Schultz' apartment and informed the apartment's property manager. The manager also stated Schultz had visited her office and "appeared to be on something because his eyes were bloodshot and he was acting a little bit awkward." She contacted law enforcement.

Officers Bradley Rhodd and Joe Kinnett, in full police uniform, responded to the call. They knocked on Schultz' exterior apartment door and heard rustling from inside. They waited approximately 30 seconds and then knocked again. This time the door opened slightly.

Rhodd testified that Schultz was directly behind the door and may have been opening it. Kinnett testified that he pushed the door a bit after it opened and yelled "police officers," and then Schultz met him and Rhodd at the door. Regardless, the officers informed Schultz that they were with the Topeka Police Department and asked if they could enter. Schultz permitted the officers to come into the apartment and stand just inside the door. At that point, the officers smelled a strong odor of marijuana, and Kinnett observed marijuana on a living room coffee table.

Kinnett asked Schultz if anyone else was inside the apartment. Schultz said, "No." Schultz' girlfriend, a juvenile, then walked into view in the living room.

Rhodd explained that the officers had come to the apartment because of the pest control worker's report. Rhodd suggested that it was disrespectful to put the worker in an awkward situation, and Schultz responded that he had not intended to do so. Rather, he said, he had merely forgotten to put the marijuana away. Schultz then admitted to smoking marijuana recently, but he denied possessing any more than a personal use amount.

Rhodd told Schultz that, if Schultz allowed the police to search the apartment without forcing them to apply for a search warrant,

they "would be as [un]intrusive as possible" and that Schultz could walk around with them. Schultz consented to the search. His girlfriend objected, but Rhodd said that she could not interfere because she was not the tenant under the apartment lease. When Schultz appeared indecisive, Rhodd continued his effort to persuade him. Rhodd testified:

"I told him basically that either, one, I could get his consent to search and be as respectful as possible, or I could apply for a search warrant. I may or may not get one but, with the evidence that I had with the pest control worker seeing the marijuana out, with the smell of marijuana, with him admitting to having marijuana being smoked recently and having personal use in the house, I asked him to place himself in the shoes of the judge whether we could get a search warrant or not."

Rhodd also told Schultz that the police were not interested in a small amount of marijuana but wanted to search for larger quantities. Schultz directed Rhodd to the apartment's spare bedroom. Kinnett stayed in the living room with Schultz' girlfriend.

In the spare bedroom, Schultz pointed to two large packages of marijuana on top of an antique record player. Rhodd later determined that the packages weighed approximately 920 grams. Rhodd also observed a scale. These observations caused Rhodd to decide that he and Kinnett were dealing with more than a personal use amount of marijuana.

Rhodd then asked Schultz to sit down at a dining room table. Schultz complied. Rhodd again explained the process of obtaining a search warrant and, again, had Schultz imagine the outcome of a warrant application. Rhodd then asked Kinnett to watch Schultz and his girlfriend while Rhodd left the apartment briefly to retrieve a form for a written consent to search.

Schultz signed the form after it was read aloud to him. He testified that he did so because the officers asked him to do so, and he admitted that neither officer shouted or threatened him. The form included a statement that Schultz could refuse to consent.

At some point during the encounter in the apartment, Schultz' girlfriend asked if she could leave. The police told her she could not.

After signing the consent form, Schultz directed Rhodd to his bedroom closet, where he pulled out a large duffel bag. Inside, Rhodd discovered several empty sandwich bags and more than 1300 grams of marijuana packaged like bricks. Rhodd asked Schultz to go back to the living room and wait for him. Schultz complied. Rhodd continued to search the bedroom, where he found an empty cooler and detected a strong odor of marijuana. He also discovered two plastic bags of fake marijuana and a personal use amount of marijuana on a night stand.

Rhodd then asked Schultz if he had any firearms in the apartment. Schultz acknowledged that there were firearms in his bedroom closet. Rhodd retrieved two unloaded shotguns, one unloaded rifle, and an unloaded paintball gun from the closet. Rhodd then noticed the marijuana Kinnett had seen earlier on the coffee table.

Rhodd arrested Schultz and drove him to the police station. Schultz did not receive his *Miranda* warnings until after he arrived at the station.

Both officers testified that Schultz was very cooperative throughout the apartment encounter. They also testified that he never revoked his initial spoken consent to search. Rhodd said that, had Schultz asked the officers to leave, they would have done so, but then would have secured the premises and applied for a search warrant. Rhodd acknowledged that Schultz was not free to leave the apartment once the officers entered it and smelled marijuana.

The State charged Schultz with possession of marijuana with intent to sell pursuant to K.S.A. 2008 Supp. 65-4163(a)(3) and failure to affix a drug stamp pursuant to K.S.A. 79-5208.

Schultz moved to suppress the physical evidence uncovered at his apartment, as well as all statements he made before being given his *Miranda* warnings. Some of these statements had been made in response to questions from the officers, and some had not.

The district judge determined that Schultz' initial spoken consent to search was voluntary, but the encounter with the officers was transformed into a custodial interrogation when Rhodd discovered the marijuana in the spare bedroom and began treating Schultz like a suspect. In view of Rhodd's direction to Schultz to

sit at the dining room table and the denial of the girlfriend's request to leave, the district judge ruled that a reasonable person in Schultz' position would not have believed he was free to leave the apartment. The district judge suppressed all physical evidence found after the point when the custodial interrogation began, as well as all incriminating statements made by Schultz between that point and the receipt of his *Miranda* warnings at the police station.

On the State's appeal to our Court of Appeals, two members of the panel affirmed the district court's decision, holding that Schultz was in custody and thus entitled to receive *Miranda* warnings as soon as Rhodd told Schultz to sit down at the dining room table. Slip op. at 11-13. The judges rejected the State's assertion that the initial spoken consent was never revoked, apparently viewing the controlling issue as whether Schultz' eventual signature on the written consent form was voluntary. The two members of the panel indicated that this voluntariness assessment would determine whether the written consent purged any taint arising from what they viewed as combined Fourth Amendment and *Miranda* violations. Concluding the written consent was involuntary, the judges observed:

"The officers were skillfully coercive in utilizing the technique of relating all of the facts they could use to request a search warrant and leading Schultz to the conclusion that one would be granted. They never told Schultz that such a search warrant could be obtained, but their conversation was designed to show that a judge would likely issue one. The change from a verbal consent to their desire to have Schultz sign a written consent shows that he was then being viewed differently by the officers." Slip op. at 14.

The two judges also wrote that the State had advanced no persuasive authority to support its "bold argument" that nontestimonial evidence may be admitted even if a violation of a criminal defendant's Fifth Amendment right has occurred. Slip op. at 19.

Court of Appeals Judge Thomas E. Malone concurred only in his fellow Court of Appeals judges' result. Slip op. at 23.

We granted the State's petition for review. The State argues that the Court of Appeals' and district court's decisions conflate Fourth and Fifth Amendment concepts. The State also asserts that, even if this court decides Schultz was in custody for purposes of *Mir-*

*anda,* the physical evidence seized during the ensuing search should be admissible because the fruit of the poisonous tree doctrine does not apply when the Fifth Amendment rather than the Fourth Amendment is at issue.

## Standards of Review

An appellate court applies a mixed standard of review when deciding motions to suppress. First, without reweighing the evidence, the court determines whether there is substantial competent evidence to support the trial court's factual findings. *State v. Morton,* 286 Kan. 632, 638-39, 186 P.3d 785 (2008). Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. Walker,* 283 Kan. 587, 594-95, 153 P.3d 1257 (2007). Second, the court "conducts a de novo review of the district court's legal conclusion drawn from those facts. [Citation omitted.]" *Morton,* 286 Kan. at 639.

## Custodial Interrogation

The first issue we must address is whether Schultz was subjected to a custodial interrogation. We have recognized that,

" ' "[t]o reduce the risk of a coerced confession and to implement the Self-Incrimination Clause" (*Chavez v. Martinez,* 538 U.S. 760, 790, 155 L. Ed. 2d 984, 123 S. Ct. 1994 [2003] [Kennedy, J., concurring in part and dissenting in part]), the United States Supreme Court, in *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602[, *reh. denied* 385 U.S. 890] (1966), concluded that states may not use statements stemming from a custodial interrogation of a defendant unless the State demonstrates the use of procedural safeguards to secure the defendant's privilege against self-incrimination.' " *Morton,* 286 Kan. at 639.

Consequently, *Miranda* warnings are required in police encounters " ' "where there has been such a restriction on a person's freedom as to render him 'in custody.' " ' " *Morton,* 286 Kan. at 639 (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 50 L. Ed. 2d 714, 97 S. Ct. 711 [1977]).

There are two parts to the inquiry on whether a custodial interrogation occurred. First, a court determines the circumstances surrounding the interrogation. Second, the court decides whether the totality of those circumstances would have led a reasonable person

to believe he or she was not at liberty to terminate the interrogation. Again, as with motions to suppress generally, an appellate court's first inquiry is limited to discerning whether substantial competent evidence supports the district court's findings of fact. We review a district court's second determination on the legal conclusion drawn from the totality of the circumstances de novo. *Morton*, 286 Kan. at 638-39.

Factors to be considered on the existence of a custodial interrogation include: (1) the interrogation's place and time; (2) the interrogation's duration; (3) the number of police officers present; (4) the conduct of the officers and the person subject to the interrogation; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) the status of the person being questioned as a suspect or a witness; (7) whether the person being questioned was escorted by the police to the interrogation location or arrived under his or her own power; and (8) the interrogation's result, *i.e.*, whether the person was ultimately allowed to leave, detained further, or arrested. No one factor outweighs another, nor do the factors bear equal weight. Every case must be analyzed on its own particular facts. *Morton*, 286 Kan. at 640.

The record before us contains ample substantial competent evidence to support the district judge's legal conclusion that Schultz was subjected to a custodial interrogation, even though the questioning took place in Schultz' apartment. The two uniformed officers kept Schultz and his girlfriend under constant observation as soon as they entered the apartment and saw them. Rhodd told Schultz to sit down at the dining room table; later he would tell Schultz to stay in the living room while he completed his search. Rhodd also asked Kinnett to watch Schultz and his girlfriend while Rhodd obtained the consent form. The officers also denied the girlfriend's request to leave the apartment. There can be little question, based on Rhodd's testimony, that Schultz was a felony suspect, not a mere witness, at least as soon as the marijuana in the spare bedroom was found. The site of the interrogation and Schultz' mode of arrival there are not persuasive in either direction. Although Schultz might ordinarily be expected to feel and exercise

a certain amount of control over events in his apartment, he and any other reasonable person would be unlikely to leave once police officers were standing inside. On the last factor, the interrogation and search led to Schultz' arrest and trip to the police station, not to his release. Moreover, although we view the situation from the perspective of a reasonable person in Schultz' circumstances rather than from the officers' subjective viewpoints, it is noteworthy that Rhodd and Kinnett acknowledged Schultz would not have been free to leave at any point after they smelled marijuana. This occurred immediately upon their entry into the apartment.

The wisest course for the officers would have been to give Schultz his *Miranda* warnings as soon as they restricted his free movement from their presence and before they began to ask him questions. Their failure to do so at least theoretically imperiled the admissibility of any evidence they gathered after Schultz was instructed to sit down at the dining room table.

We now turn to suppression.

### Suppression

Analysis of the suppression issue presented by this case must proceed on two independent tracks. Schultz challenged admission of both the statements he made and the physical evidence the police gathered. The United States Supreme Court treats the two types of evidence differently when there has been a Fifth Amendment violation through a failure to give *Miranda* warnings. The parties do not argue, and thus we do not address, any provision of the Kansas Constitution.

## Statements

The district judge decided to suppress Schultz' statements made after he was told to sit at the table. If a suspect subjected to custodial interrogation does not receive *Miranda* warnings, any resulting incriminating statements are generally inadmissible in the prosecution's case-in-chief during a subsequent trial. See *Miranda*, 384 U.S. at 467; *State v. Ewing*, 258 Kan. 398, 402-04, 904 P.2d 962 (1995); see also *Chavez v. Martinez*, 538 U.S. 760, 766-69, 155 L. Ed. 2d 984, 123 S. Ct. 1994 (2003) (core protection of Fifth

Amendment Self-Incrimination Clause prevents compelled testimony). The absence of *Miranda* warnings during a custodial interrogation raises a nearly irrebuttable presumption of police coercion of ensuing statements; introduction of such coerced statements into evidence impairs a criminal defendant's Fifth Amendment rights. See *Chavez*, 538 U.S. at 766-69; *United States v. Hubbell*, 530 U.S. 27, 49-56, 147 L. Ed. 2d 24, 120 S. Ct. 2037 (2000) (Thomas and Scalia, JJ., concurring).

Under this well-established law, the district judge was correct when he suppressed the incriminating statements made by Schultz between the time he was told to sit at the table and the time he received his *Miranda* warnings. Nothing about this case defeats the presumption that admission of the statements in the prosecution's case-in-chief would unconstitutionally compel Schultz to testify against himself.

## Physical Evidence

At this stage of this case, there appears to be no actual controversy between the parties on whether Schultz' initial spoken consent to search was voluntary. Although the officers engaged in what amounted to a game of "You Be The Judge," Schultz clearly got the message that he had the power to force a warrant procedure. There is no evidence of an explicit revocation of this initial spoken consent at any time during the encounter at Schultz' apartment. Counsel for Schultz stated repeatedly at oral argument before this court that there was no cross-appeal on this point.

The issue thus becomes whether the later, unwarranted custodial interrogation of Schultz automatically converted what was an authorized search into an unauthorized search by operation of law—either because it vitiated the initial spoken consent, polluted the written consent, or both. In short, we must decide whether the officers' failure to give Schultz *Miranda* warnings until they took him to the station compels suppression of any physical evidence discovered by them at the apartment after the custodial interrogation began.

This question is fully answered by the United States Supreme Court's decision in *United States v. Patane*, 542 U.S. 630, 159 L.

Ed. 2d 667, 124 S. Ct. 2620 (2004), a decision cited by neither the State nor Schultz. In *Patane*, five members of the Supreme Court agreed that a mere lack of *Miranda* warnings does not, under the fruit of the poisonous tree doctrine developed to vindicate Fourth Amendment rights in *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963), force suppression of physical evidence that comes to light because of an unwarned custodial interrogation. *Patane*, 542 U.S. at 636-37, 639-45. (Justice Thomas, writing for himself, two other members of the Court; Justice Kennedy, concurring in judgment for himself, Justice O'Connor).

In *Patane*, defendant Samuel Francis Patane interrupted an investigating detective's recitation of the *Miranda* warnings, asserting familiarity with them. He continued to talk with the detective and was eventually prosecuted successfully for unlawful possession of a pistol. He had orally acknowledged having the gun and then allowed it to be retrieved from his residence. Justice Thomas, writing for himself, Chief Justice Rehnquist, and Justice Scalia, thoroughly reviewed and reinforced the limits of the remedy afforded when *Miranda* rights have not been recited:

"[T]he *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause. The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement. Accordingly, there is no justification for extending the *Miranda* rule to this context. And just as the Self-Incrimination Clause primarily focuses on the criminal trial, so too does the *Miranda* rule. The *Miranda* rule is not a code of police conduct, and police do not violate the Constitution (or even the *Miranda* rule, for that matter) by mere failures to warn. For this reason, the exclusionary rule articulated in cases such as *Wong Sun* does not apply. . . .

"[Part] II

"The Self-Incrimination Clause provides: 'No person . . . shall be compelled in any criminal case to be a witness against himself.' U.S. Const., Amdt. 5. We need not decide here the precise boundaries of the Clause's protection. For present purposes, it suffices to note that the core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial. See, *e.g., Chavez v. Martinez*, 538 U.S. [at] 764-68 (plurality opinion); *id.*, at 777-79 (SOUTER, J., concurring in judgment); 8 J. Wigmore, Evidence § 2263, p. 378 (J. McNaughton rev. ed. 1961) (explaining that the Clause 'was directed at the employment of legal process to *extract from the person's own lips* an admission of guilt, which would thus take the place of other

evidence'); see also *United States v. Hubbell*, 530 U.S. [at] 49-56 (2000) (THO-MAS, J., concurring) (explaining that the privilege might extend to bar the compelled production of any incriminating evidence, testimonial or otherwise). The Clause cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements. See, *e.g., id.*, at 34 (noting that the word ' "witness" ' in the Self-Incrimination Clause 'limits the relevant category of compelled incriminating communications to those that are "testimonial" in character'); *id.*, at 35 (discussing why compelled blood samples do not violate the Clause; cataloging other examples and citing cases); [*Oregon v.*] *Elstad*, 470 U.S. [298], 304, [84 L. Ed. 2d 222], 105 S. Ct. 1285 [1985] ('The Fifth Amendment, of course, is not concerned with nontestimonial evidence'); *id.*, at 306-307 ('The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony'); *Withrow v. Williams*, 507 U.S. 680, 705[, 123 L. Ed. 2d 407, 113 S. Ct. 1745] (1993) (O'CONNOR, J., concurring in part and dissenting in part) (describing '*true* Fifth Amendment claims [as] the extraction and use of *compelled* testimony'); *New York v. Quarles*, 467 U.S. 649, 665-672, and n. 4[, 81 L. Ed. 2d 550, 104 S. Ct. 2626] (1984) (O'CONNOR, J., concurring in judgment in part and dissenting in part) (explaining that the physical fruit of a *Miranda* violation need not be suppressed for these reasons).

"To be sure, the Court has recognized and applied several prophylactic rules designed to protect the core privilege against self-incrimination. See, *e.g., Chavez, supra*, at 770-772 (plurality opinion). For example, although the text of the Self-Incrimination Clause at least suggests that 'its coverage [is limited to] compelled testimony that is used against the defendant in the trial itself,' *Hubbell, supra*, at 37, potential suspects may, at times, assert the privilege in proceedings in which answers might be used to incriminate them in a subsequent criminal case. See, *e.g., United States v. Balsys*, 524 U.S. 666, 671-672[, 141 L. Ed. 2d 575, 118 S. Ct. 2218] (1998); *Minnesota v. Murphy*, 465 U.S. 420, 426[, 79 L. Ed. 2d 409, 104 S. Ct. 1136] (1984); *cf. Kastigar v. United States*, 406 U.S. 441[, 32 L. Ed. 2d 212, 92 S. Ct. 1653] (1972) (holding that the Government may compel grand jury testimony from witnesses over Fifth Amendment objections if the witnesses receive 'use and derivative use immunity'); *Uniformed Sanitation Men Assn., Inc. v. Commissioner of Sanitation of City of New York*, 392 U.S. 280, 284[, 20 L. Ed. 2d 1089, 88 S. Ct. 1917] (1968) (allowing the Government to use economic compulsion to secure statements but only if the Government grants appropriate immunity). We have explained that '[t]he natural concern which underlies [these] decisions is that an inability to protect the right at one stage of a proceeding may make its invocation useless at a later stage.' [*Michigan v.*] *Tucker*, 417 U.S. [433], 440-441, [41 L. Ed. 2d 182, 94 S. Ct. 2357 (1974)].

"Similarly, in *Miranda*, the Court concluded that the possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated. See *Dickerson* [*v. United States*], 530 U.S. [428,] 434-435[, 147 L. Ed. 2d 405, 120 S. Ct. 2326 (2001)]; *Miranda*, 384 U.S., at 467. To protect against this danger, the *Miranda* rule creates

a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief.

"But because these prophylactic rules (including the *Miranda* rule) necessarily sweep beyond the actual protections of the Self-Incrimination Clause, see, *e.g.*, *Withrow, supra,* at 690-691; *Elstad, supra,* at 306, any further extension of these rules must be justified by its necessity for the protection of the actual right against compelled self-incrimination, *Chavez, supra,* at 778 (SOUTER, J., concurring in judgment) (requiring a ' "powerful showing" ' before 'expand[ing] . . . the privilege against compelled self-incrimination'). Indeed, at times the Court has declined to extend *Miranda* even where it has perceived a need to protect the privilege against self-incrimination. See, *e.g., Quarles, supra,* at 657 (concluding 'that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination').

"It is for these reasons that statements taken without *Miranda* warnings (though not actually compelled) can be used to impeach a defendant's testimony at trial, see *Elstad, supra,* at 307-308; *Harris v. New York,* 401 U.S. 222[, 28 L. Ed. 2d 1, 91 S. Ct. 643] (1971), though the fruits of actually compelled testimony cannot, see *New Jersey v. Portash,* 440 U.S. 450, 458-459[, 59 L. Ed.2d 501, 99 S. Ct. 1292] (1979). More generally, the *Miranda* rule 'does not require that the statements [taken without complying with the rule] and their fruits be discarded as inherently tainted,' *Elstad,* 470 U.S., at 307. Such a blanket suppression rule could not be justified by reference to the 'Fifth Amendment goal of assuring trustworthy evidence' or by any deterrence rationale, *id.,* at 308; see *Tucker, supra,* at 446-449; *Harris, supra,* at 225-226, and n. 2, and would therefore fail our close-fit requirement.

"Furthermore, the Self-Incrimination Clause contains its own exclusionary rule. It provides that '[n]o person ... shall be compelled in any criminal case to be a witness against himself.' Amdt. 5. Unlike the Fourth Amendment's bar on unreasonable searches, the Self-Incrimination Clause is self-executing. We have repeatedly explained 'that those subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial.' *Chavez,* 538 U.S., at 769 (plurality opinion) (citing, for example, *Elstad, supra,* at 307-308). This explicit textual protection supports a strong presumption against expanding the *Miranda* rule any further. *Cf. Graham v. Connor,* 490 U.S. 386[, 104 L. Ed. 2d 443, 109 S. Ct. 1865] (1989).

"Finally, nothing in *Dickerson,* including its characterization of *Miranda* as announcing a constitutional rule, 530 U.S., at 444, changes any of these observations. Indeed, in *Dickerson,* the Court specifically noted that the Court's 'subsequent cases have reduced the impact of the *Miranda* rule on legitimate law enforcement while reaffirming [*Miranda*]'s core ruling that unwarned statements may not be used as evidence in the prosecution's case in chief.' *Id.,* at 443-444. This description of *Miranda,* especially the emphasis on the use of 'unwarned

statements . . . in the prosecution's case in chief,' makes clear our continued focus on the protections of the Self-Incrimination Clause. The Court's reliance on our *Miranda* precedents, including both *Tucker* and *Elstad*, see, *e.g.*, *Dickerson*, *supra*, at 438, 441, further demonstrates the continuing validity of those decisions. In short, nothing in *Dickerson* calls into question our continued insistence that the closest possible fit be maintained between the Self-Incrimination Clause and any rule designed to protect it.

"[Part] III

"Our cases also make clear the related point that a mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights or even the *Miranda* rule. So much was evident in many of our pre-*Dickerson* cases, and we have adhered to this view since *Dickerson*. See *Chavez*, 538 U.S., at 772-773 (plurality opinion) (holding that a failure to read *Miranda* warnings did not violate the respondent's constitutional rights); 538 U.S., at 789 (KENNEDY, J., concurring in part and dissenting in part) (agreeing 'that failure to give a *Miranda* warning does not, without more, establish a completed violation when the unwarned interrogation ensues'); *Elstad*, *supra*, at 308; *Quarles*, 467 U.S., at 654; cf. *Chavez*, *supra*, at 777-779 (SOUTER, J., concurring in judgment). This, of course, follows from the nature of the right protected by the Self-Incrimination Clause, which the *Miranda* rule, in turn, protects. It is 'a fundamental *trial* right.' *Withrow*, 507 U.S., at 691 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264[, 108 L. Ed. 2d 222, 110 S. Ct. 1056] (1990)). See also *Chavez*, 538 U.S., at 766-768 (plurality opinion); *id.*, at 790 (KENNEDY, J., concurring in part and dissenting in part) ('The identification of a *Miranda* violation and its consequences, then, ought to be determined at trial.')

"It follows that police do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*. Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial. And, at that point, '[t]he exclusion of unwarned statements . . . is a complete and sufficient remedy' for any perceived *Miranda* violation. *Chavez*, *supra*, at 790.

"Thus, unlike unreasonable searches under the Fourth Amendment or actual violations of the Due Process Clause or the Self-Incrimination Clause, there is, with respect to mere failures to warn, nothing to deter. There is therefore no reason to apply the 'fruit of the poisonous tree' doctrine of *Wong Sun*, 371 U.S., at 488. See also *Nix v. Williams*, 467 U.S. 431, 441[, 81 L. Ed. 2d 377, 104 S. Ct. 2501] (1984) (discussing the exclusionary rule in the Sixth Amendment context and noting that it applies to '*illegally* obtained evidence [and] other incriminating evidence derived from [it]' (emphasis added)). It is not for this Court to impose its preferred police practices on either federal law enforcement officials or their state counterparts.

"[Part] IV

"In the present case, the [Tenth Circuit] Court of Appeals, relying on *Dickerson*, wholly adopted the position that the taking of unwarned statements violates

a suspect's constitutional rights. [*United States v. Patane*,] 304 F.3d [1013], at 1028-1029 [10th Circuit (2002)]. And, of course, if this were so, a strong deterrence-based argument could be made for suppression of the fruits. See, *e.g.*, *Nix*, *supra*, at 441-444; *Wong Sun*, *supra*, at 484-486; cf. *Nardone v. United States*, 308 U.S. 338, 341[, 84 L. Ed. 307, 60 S. Ct. 266 (1939).

"But *Dickerson*'s characterization of *Miranda* as a constitutional rule does not lessen the need to maintain the closest possible fit between the Self-Incrimination Clause and any judge-made rule designed to protect it. And there is no such fit here. Introduction of the nontestimonial fruit of a voluntary statement, such as respondent's Glock [his handgun], does not implicate the Self-Incrimination Clause. The admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial. In any case, '[t]he exclusion of unwarned statements . . . is a complete and sufficient remedy' for any perceived *Miranda* violation. *Chavez*, *supra*, at 790 (KENNEDY, J., concurring in part and dissenting in part). See also H. Friendly, Benchmarks 280-281 (1967). There is simply no need to extend (and therefore no justification for extending) the prophylactic rule of *Miranda* to this context.

"Similarly, because police cannot violate the Self-Incrimination Clause by taking unwarned though voluntary statements, an exclusionary rule cannot be justified by reference to a deterrence effect on law enforcement, as the Court of Appeals believed, 304 F.3d, at 1028-1029. Our decision not to apply *Wong Sun* to mere failures to give *Miranda* warnings was sound at the time *Tucker* and *Elstad* were decided, and we decline to apply *Wong Sun* to such failures now.

"The Court of Appeals ascribed significance to the fact that, in this case, there might be 'little [practical] difference between [respondent's] confessional statement' and the actual physical evidence. 304 F.3d, at 1027. The distinction, the court said, 'appears to make little sense as a matter of policy.' *Ibid*. But, putting policy aside, we have held that '[t]he word "witness" in the constitutional text limits the' scope of the Self-Incrimination Clause to testimonial evidence. *Hubbell*, 530 U.S., at 34-35. The Constitution itself makes the distinction. And although it is true that the Court requires the exclusion of the physical fruit of actually coerced statements, it must be remembered that statements taken without sufficient *Miranda* warnings are presumed to have been coerced only for certain purposes and then only when necessary to protect the privilege against self-incrimination. See Part II, *supra*. For the reasons discussed above, we decline to extend that presumption further." *Patane*, 542 U.S. at 636-44.

Justice Kennedy, writing for himself and Justice O'Connor in *Patane* and concurring in the judgment of their three colleagues, stated:

"In . . . *Elstad*, 470 U.S. [at 308], . . . *Quarles*, 467 U.S. [at 671], and *Harris*. . . , 401 U.S. [at 223-26], evidence obtained following an unwarned interrogation was held admissible. This result was based in large part on our recognition

that the concerns underlying the *Miranda* [citation omitted] rule must be accommodated to other objectives of the criminal justice system. I agree with the plurality that *Dickerson* [citation omitted] did not undermine these precedents and, in fact, cited them in support. Here, it is sufficient to note that the Government presents an even stronger case for admitting the evidence obtained as the result of Patane's unwarned statement. Admission of nontestimonial physical fruits (the Glock [handgun] in this case), even more so than the postwarning statements to the police in *Elstad* and . . . *Tucker* [citation omitted] does not run the risk of admitting into trial an accused's coerced incriminating statements against himself. In light of the important probative value of reliable physical evidence, it is doubtful that exclusion can be justified by a deterrence rationale sensitive to both law enforcement interests and a suspect's rights during an in-custody interrogation. Unlike the plurality, however, I find it unnecessary to decide whether the detective's failure to give Patane the full *Miranda* warnings should be characterized as a violation of the *Miranda* rule itself, or whether there is '[any]thing to deter' so long as the unwarned statements are not later introduced at trial. *Ante,* at 641-42." *Patane,* 542 U.S. at 644-45 (Kennedy, J., concurring).

Although we have not previously applied *Patane* in Kansas, the approaches taken by federal courts of appeals and in at least two of our sister states are consistent with it. See *United States v. Shlater,* 85 F.3d 1251, 1256 (7th Cir. 1996) (consent to search home not interrogation under *Miranda,* even though defendant's consent provided after request for attorney pursuant to Fifth Amendment); *United States v. Hidalgo,* 7 F.3d 1566, 1568 (11th Cir. 1993) (Fifth Amendment does not apply even though defendant consented to search after receiving *Miranda* warnings); *United States v. Smith,* 3 F.3d 1088, 1098 (7th Cir. 1993) (incriminating evidence discovered during unwarned custodial investigation may be introduced into evidence, as defendant voluntarily consented to search); *United States v. Rodgriguez-Garcia,* 983 F.2d 1563, 1567-68 (10th Cir. 1993) (incriminating evidence may be admitted even though defendant consented to search after receiving *Miranda* warnings); *Cody v. Solem,* 755 F.2d 1323, 1330 (8th Cir. 1985) (consent to search not incriminating statement); *Garcia v. State,* 979 So. 2d 1189, 1193-94 (Fla. Dist. App. 2008) (Fifth Amendment protects only testimonial evidence; "[f]ederal courts are in accord that a consent to search is not an interrogation requiring *Miranda* warnings."); *State v. Morato,* 619 N.W.2d 655, 662 (S.D. 2000) (consent to search not an incriminating statement).

Moreover, this court has held that a valid consent to search does not require *Miranda* warnings. *State v. Ulriksen*, 210 Kan. 795, 798, 504 P.2d 232 (1972) (no previous warnings required); *State v. Stein*, 203 Kan. 638, 639, 456 P.2d 1 (1969) (same); *State v. McCarty*, 199 Kan. 116, 119-20, 427 P.2d 616 (1967), *cert. denied* 392 U.S. 308 (1968) (officer not required to warn suspect during consensual search that anything discovered during search may be used as evidence against him, her).

Because Schultz' initial spoken consent was voluntary and un-revoked and the absence of *Miranda* warnings did not convert the officers' authorized search into an unauthorized one as a matter of law, it was not necessary for the officers to obtain a second, written or spoken consent. Furthermore, no second voluntary consent was needed to purge prior taint arising out of either a Fourth Amendment violation or, under *Patane*, the officers' failure to give timely *Miranda* warnings.

The district court is affirmed in part and reversed in part; the Court of Appeals is affirmed in part and reversed in part; and we remand this case to the district court with directions for further proceedings consistent with this opinion.

ROSEN, J., not participating.

MARQUARDT, J., assigned.