No. 98,812

STATE OF KANSAS, *Appellee*, v. ROBERT JOHNSON, *Appellant*.

(259 P.3d 719)

Opinion filed September 2, 2011.

*Ryan Eddinger*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*David H. Matthews*, assistant district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by:

SCHMISSEUR, J.: Robert L. Johnson was charged with one felony count of possession of cocaine in violation of K.S.A. 65-4160(a), one misdemeanor count of possession of marijuana in violation of

K.S.A. 65-4162(a), and one felony count of possession of a controlled substance without a tax stamp affixed in violation of K.S.A. 79-5204 and K.S.A. 79-5208. A jury returned a guilty verdict on the possession counts and acquitted on the tax stamp charge. The district court sentenced Johnson to 18 months' probation, with underlying concurrent sentences of 15 months' imprisonment for the cocaine possession and 12 months in county jail for the marijuana conviction. Johnson appealed his convictions to the Court of Appeals, which affirmed the district court. We granted Johnson's petition for review under K.S.A. 20-3018(b), obtaining jurisdiction under K.S.A. 60-2101(b).

Johnson contends that Federal Bureau of Investigation (FBI) task-force officers lacked reasonable suspicion to detain him. We agree. Accordingly, we reverse the district court and the Court of Appeals and vacate the defendant's sentences.

## FACTS

Officers assigned to an FBI violent crimes task force were looking to execute an arrest warrant for Shane Thompson. In order to find Thompson, the task-force officers relied on a "face sheet," which is a document issued by the Department of Corrections that contains a picture of Thompson as well as his physical description. According to the face sheet, Thompson was a black male with short hair and facial hair, who weighed about 160 pounds and was 5'2" tall. None of the task-force officers was familiar with Thompson.

The task force received a tip that Thompson was staying with his mother in Kansas City, Kansas. The task-force officers drove to the location. According to their testimony, the task-force members spoke with Thompson's mother, who informed them that Thompson was not at the residence. The task-force officers then left. An officer testified that a resident of the house stated that Thompson slept there. The State presented no evidence that Thompson slept there the previous night, nor was there any evidence that he recently left the house.

Approximately 5 blocks away from Thompson's mother's residence, Robert Johnson and Eugene Brown were walking on a sidewalk. Johnson is approximately 5'11" tall, and Brown stands around

5'9". Both men are black and have facial hair. The officers, in multiple unmarked squad cars with emergency lights activated, exited their cars, drew their weapons, and approached Johnson and Brown and requested identification. Officer Michael Blegen of the Missouri Department of Corrections and a member of the FBI task force later searched Johnson and discovered marijuana and crack cocaine. Johnson was arrested and later charged with possession of marijuana, possession of cocaine, and possession of a controlled substance without a tax stamp.

The officers testified that they stopped Johnson and Brown because of Johnson's and Brown's proximity to Thompson's mother's house and their similar appearance to Thompson, *i.e.*, they were black males with short hair and facial hair. The officers stated that there was nothing suspicious about Johnson's and Brown's actions. Furthermore, the officers testified that Johnson looked less like Thompson than Brown. Finally, the officers did not consider the physical differences between Thompson and Johnson relevant. Officer Blegen dismissed the differences in height by stating, "[S]ometimes on our face sheets and the information we receive are not always accurate." To the extent Johnson did not look like Thompson, Officer Blegen testified, "[T]here are times when the people don't actually look like the photos."

Johnson filed a motion to suppress arguing there was a lack of reasonable suspicion to detain him. At the suppression hearing, the district court denied the motion after listening to Officer Blegen's testimony. Shortly before trial, Johnson renewed his motion to suppress, and the district court granted Johnson a continuing objection during trial. The jury found Johnson guilty on the possession charges but acquitted on the tax stamp charge. After trial, Johnson filed a motion for a new trial, essentially renewing the motion to suppress. The district court granted Johnson 18 months' probation, suspending his underlying 15-month prison sentence for the cocaine possession and his 12-month jail time for the marijuana possession. Johnson appealed to the Court of Appeals, which affirmed his convictions in an unpublished opinion. *State v. Johnson*, No. 98,812, 2009 WL 929062, at *4 (2009).

Additional facts will be added as necessary for the discussion below.

## DISCUSSION

In his brief, Johnson presents multiple arguments stemming from his detention, search, and subsequent arrest. Because we conclude that Johnson was illegally seized, we address only his first issue: whether the officer possessed reasonable suspicion to detain him.

### Standard of Review

"An appellate court reviews the factual underpinnings of a motion to suppress by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard with independent judgment. [Citations omitted.]" *State v. Ernesti*, 291 Kan. 54, 64, 239 P.3d 40 (2010). "Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion." *State v. Schultz*, 289 Kan. 334, 340, 212 P.3d 150 (2009).

The State bears the burden to demonstrate that a challenged search or seizure was lawful. *State v. McGinnis*, 290 Kan. 547, 551, 233 P.3d 246 (2010). The appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. McMullen*, 290 Kan. 1, 4, 221 P.3d 92 (2009).

However, because the parties do not dispute the material facts, our suppression question is solely one of law. See *State v. Thomas*, 291 Kan. 676, 682, 246 P.3d 678 (2011). Consequently, we exercise unlimited review in determining whether Johnson's encounter was consensual or, if it was an investigatory detention, whether it was supported by reasonable suspicion.

### Analysis

Johnson argues that the district court erred in denying his motion to suppress. He contends that the encounter with the FBI task force was an investigatory detention unsupported by reasonable suspicion of criminal activity. As a result, Johnson demands that all evidence obtained be excluded as fruit of the poisonous tree. See

*Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). In response, the State does not deny that the encounter was an investigatory detention but contends that it was supported by reasonable suspicion.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Section 15 of the Kansas Constitution Bill of Rights provides lockstep protection to the Fourth Amendment. *State v. Moore*, 283 Kan. 344, 349, 154 P.3d 1 (2007).

"The United States Supreme Court has developed a 'totality of the circumstances' test to determine if there is a seizure, or instead a consensual encounter. [Citation omitted.] '[U]nder the test, law enforcement interaction with a person is consensual, not a seizure if, under the totality of the circumstances, the law enforcement officer's conduct conveys to a reasonable person that he or she was free to refuse the requests or otherwise end the encounter.' [Citations omitted.]" *McGinnis*, 290 Kan. at 552.

Johnson was seized the moment the officers exited their unmarked squad cars. The task-force officers were wearing FBI insignia on their clothes; their emergency lights were activated on their squad cars; and some of the officers had drawn their guns. Under the totality of the circumstances test, the officers seized Johnson because a reasonable person would not feel free to refuse an officer's request or otherwise end the encounter when surrounded by an FBI task force with weapons drawn. See *McGinnis*, 290 Kan. at 552.

Thus we must analyze whether there was a reasonable articulable suspicion of criminal involvement at the moment Johnson was seized. See *State v. DeMarco*, 263 Kan. 727, 734, 952 P.2d 1276 (1998). Seizures are generally permissible if " 'an objective officer would have a reasonable and articulable suspicion that the detainee committed, is about to commit, or is committing a crime.' " *Thomas*, 291 Kan. at 687 (quoting *State v. Pollman*, 286 Kan. 881, 889, 190 P.3d 234 [2008]). We recently discussed considerations for how "reasonable suspicion" are evaluated in *Thomas*, 291 Kan. at 687-88, where we stated:

" ' " "What is reasonable is based on the totality of the circumstances and is viewed in terms as understood by those versed in the field of law enforcement.' [Quoting *State v. Toney*, 253 Kan. 651, 656, 862 P.2d 350 (1993).] . . .

" '[W]e judge the officer's conduct in light of common sense and ordinary human experience. [Citation omitted.] "Our task . . . is not to pigeonhole each purported fact as either consistent with innocen[ce] . . . or manifestly suspicious," [citation omitted], but to determine whether the totality of the circumstances justify the detention. [Citation omitted.] We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, [citation omitted], remembering that reasonable suspicion represents a "minimum level of objective justification" which is "considerably less than proof of wrongdoing by a preponderance of the evidence." ' " 263 Kan. at 734-35 (quoting *United States v. Mendez*, 118 F.3d 1426, 1431 [10th Cir. 1997]; citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 [1989]).'

"Similarly, the United States Supreme Court has stated:

" ' "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification. . . . [Citation omitted.] The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity. [Citation omitted.]" *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000).' *Moore*, 283 Kan. at 354-55.

"Whether reasonable suspicion exists is a question of law. We use a mixed question standard of review, determining whether substantial competent evidence supports the district court's findings, while the legal conclusion is reviewed de novo. *Moore*, 283 Kan. at 350 (citing *Ornelas v. United States*, 517 U.S. 690, 699, 116 S. Ct. 1657, 134 L. Ed. 2d 911 [1996])."

The State contends the task force possessed reasonable suspicion to seize Johnson because of Johnson's and Brown's similar appearance to Thompson, combined with their proximity to Thompson's mother's residence. We disagree. The officers in this case lacked reasonable suspicion because: (1) Johnson's location was not related to criminal activity; (2) there is no evidence that the officers used reliable information; and (3) the physical description of "black man with facial hair" was too broad to be of any assistance in formulating reasonable suspicion.

First, Johnson's location was not related to criminal activity. In *State v. Baker*, 239 Kan. 403, 720 P.2d 1112 (1986), police officers were approximately 16 blocks from the scene of the armed robbery in a familiar area when the robbery report came over the radio.

The initial broadcast stated the robbery was committed by two black men dressed in black jackets and blue jeans. The officers proceeded to the scene in routes they believed the robbers may have used to flee the scene. En route to the scene, the officers encountered a white Chevy containing three black men dressed in black. The officer followed the car and eventually arrested its occupants.

The *Baker* court concluded that even though dispatch's report stated there were only two robbers and provided no information how the robbers made their getaway, it was not unreasonable for the officers to anticipate the robbers fleeing in a waiting vehicle with a third person acting as the wheelman. In light of all the information available to the officers, when coupled with the officers' background, training, and experience, we determined that they possessed reasonable suspicion to make the stop. 239 Kan. at 408-09.

Similarly, in *State v. Glass*, 40 Kan. App. 2d 379, 192 P.3d 651 (2008), *rev. denied* 288 Kan. 834 (2009), police dispatch described two suspects, within 30 seconds of a reported liquor store robbery, as "black males wearing white t-shirts and black hooded zip-up jackets, who left westbound on foot around the building." 40 Kan. App. 2d at 380. Within 1 minute of receiving the dispatch, an officer who was just a few blocks away from the liquor store noticed a singular vehicle driving away from the crime scene. The officer drove past the vehicle, shone a light inside, and noticed "two black males in the front seat." 40 Kan. App. 2d at 380. One occupant was wearing a white t-shirt and the other was wearing a black outfit. The officer stopped the car and eventually arrested the occupants after finding one was stuffing something between seat and console and another had a large sum of money fall out of his lap. The court concluded the officer had reasonable suspicion to lawfully stop the vehicle. 40 Kan. App. 2d at 385-88.

Finally, in *State v. Walker*, 292 Kan. 1, 251 P.3d 618 (2011), we concluded that the officer possessed reasonable suspicion to detain the defendant who semi-fit the description of the wanted individual and was within 2 blocks of a current crime scene. In *Walker*, a burglary victim told the officer that "a black male wearing a black

shirt and black shorts" stole his CD case and vandalized his truck. 292 Kan. at 3. The victim told the officer that the individual set off eastbound on foot. The officer drove in the direction of the suspect's direction of travel. In less than 5 minutes and within 2 blocks from the crime scene, the officer came into contact with Walker, who matched the victim's description of the perpetrator.

The officer detained Walker and eventually arrested him. In concluding that the officer possessed reasonable suspicion to seize Walker, we noted that (1) the officer received information from an identified citizen, (2) Walker was within 2 blocks of the crime scene; (3) as indicated by the victim, Walker was east of the crime scene and was found within 5 minutes; (4) Walker matched the race, gender, and number of suspects; and (5) Walker was wearing a dark shirt and dark shorts. *Walker*, 292 Kan. at 11-12.

Unlike the situations in *Walker*, *Baker*, and *Glass*, there was no relationship between Johnson's location and criminal activity. Officer Blegen testified at the suppression hearing that there was nothing suspicious about the neighborhood or the behavior of Johnson and Brown. There was no evidence that Thompson's mother told the task-force officers anything about Thompson's current location. Instead, the officers assumed that Thompson (1) slept at his mother's house the previous night; (2) left recently; (3) left on foot; (4) headed southbound; and (5) left with an acquaintance.

Second, the officers either lacked reliable information or chose to ignore the available information. The officers possessed a face sheet issued from the Department of Corrections that contained a photograph of Thompson as well as provided his physical characteristics. According to the face sheet, Johnson is 9 inches taller than Thompson. Yet officers ignored the differences in appearances, including the significant disparity in height.

Officer Blegen dismissed this variance simply by stating, "[S]ometimes on our face sheets and the information we receive are not always accurate." At the suppression hearing, Officer Blegen acknowledged that Johnson was not a perfect match and stated that "there are times when the people don't actually look like the photo." Later at trial when asked if the face sheets are wrong a lot

of the time or a small amount of times, Blegen replied, "Several times it's been wrong."

The State bears the burden to prove a lawful seizure. See *Moore*, 283 Kan. at 349. Ironically, however, the State attempts to justify the seizure solely based upon the face sheet by impeaching its veracity and application. The State presented no evidence that it was reliable for the officers to rely on the warrant or the face sheet. See *DeMarco*, 263 Kan. at 735. In fact, the only testimony the State presented was just the opposite: The face sheet was unreliable.

While reasonable suspicion can arise from information that is less reliable than what is required to show probable cause, the task-force officer's own testimony indicates either the face sheet was unreliable or the officers chose to simply ignore it. See *DeMarco*, 263 Kan. at 735. Either is unreasonable. First, if the officers chose to ignore the information, the stop was the result of nothing more than a hunch because, as the officers stated, there was nothing suspicious about the behavior of Johnson. See *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). Second, the State may not justify the seizure based solely on a face sheet by presenting testimony that the face sheet was unreliable. The State has failed to meet its burden to show that it was reasonable for the officers to rely on the face sheet. See *State v. Marx*, 289 Kan. 657, 675, 215 P.3d 601 (2009).

Finally, the task force indicated that Johnson was detained because he shared common features with Thompson, mainly he was a black male with facial hair. Without more, however, such a "description is so nonspecific or generic in nature as to defy reasonable suspicion of criminal activity." *State v. Anguiano*, 37 Kan. App. 2d 202, 207, 151 P.3d 857 (2007); see also *United States v. Hudson*, 405 F.3d 425, 438 n.9 (6th Cir. 2005) ("The existence of an arrest warrant is of no moment on the question whether a particular person police officers come across is in fact the subject of the warrant. The warrant supplies the officers with probable cause to arrest the person it names and describes, not a license to duck the reasonable suspicion requirement and stop someone they only have a subjective hunch is that person."); *Dennis v. State*, 927 So. 2d 173, 175 (Fla. Dist. App. 2006) (stating officers lacked reasonable suspicion

to stop an individual because similarities in race, gender, hairstyle, and forehead were insufficient to give the officers "well-founded suspicion" that the defendant was the individual named in the arrest warrant).

We conclude that under the totality of the circumstances the task-force officers lacked reasonable suspicion as a matter of law. We reverse the Court of Appeals and the district court and vacate the sentences.

ROBERT J. SCHMISSEUR, District Judge, assigned.