IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,636

STATE OF KANSAS,
*Appellant*,

v.

SHAUN LEE SCHOOLER,
*Appellee.*

SYLLABUS BY THE COURT

1.

A routine traffic stop is a seizure under the Fourth Amendment to the United States Constitution.

2.

Traffic stops cannot be measurably extended beyond the time necessary to process the infraction that prompted the stop unless there is a reasonable suspicion of or probable cause to believe there is other criminal activity, or consent.

3.

Beyond simply determining whether to issue a citation, a law enforcement officer's mission in a traffic stop typically includes ordinary inquiries for: (i) checking the driver's license; (ii) determining whether there are outstanding warrants against the driver; and (iii) inspecting the automobile's registration and proof of insurance. The officer may also take negligibly burdensome precautions for officer safety. Information gathering must be limited to the infraction prompting the stop or those matters directly related to traffic code enforcement, i.e., ensuring vehicles on the road are operated safely and responsibly.

4.

While a driver is being detained for a routine traffic stop, a law enforcement officer may not conduct questioning unrelated to the officer's mission if it measurably extends the stop—absent probable cause or the reasonable suspicion ordinarily demanded to justify detaining an individual.

5.

A law enforcement officer need not disregard information that may lead the officer to suspect other criminal activity during a traffic stop. When the detainee's responses and circumstances lead to suspicions unrelated to the traffic offense, an officer may broaden the inquiry and satisfy those suspicions.

6.

Travel plan questioning is not always within a traffic stop's scope. The circumstances will dictate that. To fall within the stop's scope, such questions must have a close connection to the initial infraction under investigation or to roadway safety, i.e., ensuring vehicles on the road are operated safely and responsibly. Otherwise, they may be pursued by law enforcement only at the same time as the officer is completing the tasks appropriate for processing the initial infraction. Questioning outside the stop's scope may not measurably extend the stop's duration absent reasonable suspicion or probable cause to independently support the additional detention.

7.

Reasonable suspicion is a lower standard than probable cause. What is reasonable depends on the totality of the circumstances in the view of a trained law enforcement officer. In determining whether reasonable suspicion exists, the court must judge the officer's actions in light of common sense and ordinary human experience.

8.

The totality of the circumstances standard does not envision a reviewing court pigeonholing each factor as to innocent or suspicious appearances, but instead requires a determination whether all the circumstances justify the detention. The relevant inquiry is not whether particular conduct is innocent or guilty, but whether a sufficient degree of suspicion attaches to particular types of noncriminal acts. The totality of the circumstances standard prohibits a divide-and-conquer analysis under which factors that are readily susceptible to an innocent explanation are entitled to no weight.

Review of the judgment of the Court of Appeals in an unpublished opinion filed May 19, 2017. Appeal from Geary District Court; STEVEN L. HORNBAKER, judge. Opinion filed June 22, 2018. Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed and the case remanded.

*Tony R. Cruz*, assistant county attorney, argued the cause, and *Derek Schmidt*, attorney general, was on the briefs for appellant.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: The Fourth Amendment to the United States Constitution requires that traffic stops not be measurably extended beyond the time necessary to process the infraction prompting the stop—unless there is consent, or a reasonable suspicion of or probable cause to believe there is other criminal activity. *Rodriguez v. United States*, 575 U.S. __, 135 S. Ct. 1609, 1615, 191 L. Ed. 2d 492 (2015). In the current case, the State seeks interlocutory review of a district court decision suppressing from evidence 38 pounds of marijuana seized after a traffic stop along I-70. The court found the stop was impermissibly extended. A Court of Appeals panel affirmed. *State v. Schooler*, No.

3

116,636, 2017 WL 2212102, at *6 (Kan. App. 2017) (unpublished opinion). We granted review and now reverse.

The issue is whether the lower courts correctly concluded the stop was unconstitutionally extended. The analysis is complicated by the timing and other details attendant to the stop, including the deputy's questions and the driver's responses. See *State v. Jimenez*, (No. 116,250 this date decided), slip op. at 19 (noting circumstances dictate how a court views an officer's progressive questioning during a traffic stop). As opposed to the lower courts, we determine that (1) discrepancies between the driver's statements and the vehicle-related documents justified the deputy's questioning; (2) the questioning occurred simultaneously with the deputy's appropriate steps in processing the traffic stop; and (3) the circumstances provided reasonable suspicion to extend the detention for a drug dog sniff. We remand the case to the district court for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

The facts are undisputed and supported by an audio/video recording. We must detail what happened because "[a]ssessing whether an officer unreasonably prolonged a stop involves 'highly fact-specific inquiries.'" *United States v. Hill*, 849 F.3d 195, 201 (4th Cir. 2017); see also *Jimenez*, slip op. at 20 (Caselaw "requires careful case-by-case evaluation to determine how the officer conducted or ordered the activities associated with the traffic stop.").

In February 2016, Shaun Schooler was driving a rented 2016 Dodge pickup eastbound on I-70 when Geary County Sheriff's Deputy Justin Stopper noticed snow obstructing the license tag's lower half. The deputy initiated a traffic stop. He approached Schooler's vehicle from the passenger side, explained the reason for the stop, and asked

4

for his driver's license and vehicle registration, which in this instance was a rental agreement.

As Schooler complied, the deputy immediately asked where he was coming from. He responded Denver, Colorado, heading to Kansas City to fly back home to California. He told Stopper he had flown in to Kansas City before traveling to Denver. The rental agreement, however, stated the vehicle was rented in California a few days earlier and was due back at the same location a couple of days after the stop. The deputy later testified the rental location and dates were peculiar to him because of Schooler's explanations about his travel itinerary. Stopper asked why Schooler was in Denver. He said he was skiing with friends and had dropped off a 16-foot trailer. Stopper asked why he did not fly out of Denver. Schooler explained "it was just cheaper to do it that way." Stopper asked Schooler to confirm he flew into Kansas City, and Schooler volunteered: "The car rental is from San Diego. I totally know that it is. It's just how they did it with the trailer and stuff, sir." When Stopper suggested "normally" a "different rental place" is not listed on a rental agreement, Schooler said "it's not all me." Schooler offered to produce airline tickets and began searching for them inside the vehicle.

While Schooler looked for his tickets, Stopper asked what kind of trailer he dropped off and expressed disbelief the truck could accommodate that trailer type. Stopper asked where he picked up the trailer. Schooler said in Kansas City from a friend. Stopper asked how that "work[ed] out[.]" While Schooler continued to search for his airline tickets, Stopper commented on a "giant duffel bag" the officer saw in the truck's back seat.

Schooler could not locate his airline tickets and believed they were in another backpack, which he asked to get from the back seat. Because it was cold, Stopper suggested they sit in his patrol vehicle. Schooler agreed. The deputy later testified he

5

suspected criminal activity as he left the truck's passenger side to return to his own vehicle. He said his suspicions at this point were based on detecting the odor of air fresheners from the rental vehicle; observing multiple cell phones, the large duffle bag, other items, and debris in the passenger compartment; and noting the peculiarities with Schooler's explanations about his travels and the vehicle rental arrangement. The deputy texted for a drug dog. At this point, about three minutes had passed from the stop.

Inside the patrol car, the deputy continued questioning while reviewing Schooler's driver's license and rental documents and entering information into his vehicle's mobile data terminal. He asked when Schooler got to Kansas City. He responded "they rented it" on Friday, he "got into Kansas City on Saturday, [and] skied Sunday, Monday." He reiterated, "[T]hey did rent [the vehicle] out of San Diego," and he "just picked it up in Kansas City." He explained he had a truck stolen and "Geico Insurance rented it, in [his] name, and [he] picked it up in Kansas City." He said either Geico or Enterprise "took [the truck] out" to Kansas City. During this time, Schooler searched a backpack he brought into the patrol vehicle for airline tickets. He never found them.

Stopper continued prodding, saying he had "never heard of anything like this happening." Schooler said he took the trailer to Colorado to help out some friends. When Stopper asked their names, Schooler said, "Oh. Alright." Then, after a pause, he asked if he was "in some kind of trouble . . . ." Stopper responded, "Well, your story's a little odd. I'm just trying to make sure everything's on the up-and-up and legit here." The encounter had lasted five minutes and 45 seconds at this point.

About six minutes into the stop, the deputy received responses on his mobile data terminal advising him that Schooler was on federal supervised release. Stopper learned there were no outstanding warrants and the vehicle registration checked out properly. Schooler denied being "on probation or anything," but said he had been arrested "for a

6

few things . . . ." Schooler soon admitted his supervised release status but denied being on probation. When asked why he was on federal supervised release, Schooler sighed and said "that was," paused, sighed, and then told Stopper he was not "up to [unintelligible] no good" and was "just trying to get home."

About seven minutes and 30 seconds into the stop, Stopper radioed his dispatch with Schooler's driver's license number and date of birth. He explained at the suppression hearing he did this to get additional information and verify what Schooler was telling him because the mobile data terminal could not access the appropriate databases. While waiting, the deputy returned to questioning about "pretrial status and stuff" because he knew "most times" a person on pretrial supervision is not supposed to leave the state. The deputy asked what Schooler got in trouble for, and Schooler said it was for controlled substances. Stopper asked how much and Schooler said "very little." Stopper asked why it was federal supervision, and Schooler said "it was on a base" in 2005. Stopper expressed disbelief Schooler was still on probation in 2016, and Schooler said that status would last another five years. The deputy asked what kind of controlled substance and Schooler said "a little bit of cocaine . . . ." Stopper later testified he believed the probation term Schooler described meant the conviction was "probably [for] more than just a little bit of cocaine." Stopper resumed questioning about the trailer and trip to Colorado. Schooler said he picked it up from a friend's friend.

At about nine minutes and 40 seconds into the stop, the deputy asked Schooler if he was "being truthful" because he had "never heard anything like this." Schooler said there was nothing for him to lie about. Schooler offered to make a phone call. The deputy declined but persisted in asking why the friends did not move their own trailer and commenting it was a long way out of the way. Schooler could not recall from whom he picked up the trailer. Stopper then asked how much Schooler's baggage fees were because the large duffel bag was probably expensive to take on a plane. He also noted

7

Schooler had other large items in the truck, which Schooler said mostly came from the duffel bag, although that bag appeared full.

At about 11 minutes and 45 seconds into the stop, the deputy explained to Schooler he was continuing to wait for record check verifications. Stopper asked Schooler to verify his address again, asked him to explain his supervised release, and inquired about prior arrests. The deputy asked Schooler if he was "actually supposed to be out of the state." Stopper again asked when Schooler flew into Kansas City.

At about 13 minutes into the stop, the deputy radioed to dispatch variations in the vehicle license tag numbers, noting the snow was obscuring some letters and numbers and some might have been reported incorrectly earlier. At that point, the deputy received a radio call that seems to have conveyed additional criminal history information. Then, referring to Schooler's earlier statement that he had been arrested for "a little bit of cocaine," Stopper said, "I think that was more than just a little bit, it said importation." Schooler responded, "[I]t's just what they hit me with, sir," saying it was a federal matter and happened on a military base.

Almost 15 minutes into the stop, the deputy again read license plate number variations into the radio.

At 17 minutes into the stop, the deputy explained he was giving Schooler a warning ticket for the obscured license plate and asked Schooler for his signature. Stopper then told Schooler, "[Y]ou're good to go." This was 18 minutes into the stop.

Almost immediately, the deputy said, "Mr. Schooler, can I ask you a couple more questions?" As Schooler began to say he "just [wanted] to get back on the road," Stopper asked if he had contraband, large amounts of currency, or firearms in his vehicle.

8

Schooler said he did not and denied a request to search the truck. Stopper told Schooler he was being detained because "[y]our story's garbage. I believe criminal activity is afoot." The stop lasted 18 minutes and 30 seconds up to this point.

A drug dog arrived 11 minutes later. Schooler continued denying anything illegal was in the truck. The dog alerted. Inside the duffle bag, 38 pounds of marijuana and a set of scales were discovered. Schooler was arrested and charged with narcotics offenses. See K.S.A. 2017 Supp. 21-5705(a) (possession with intent to distribute); K.S.A. 79-5208 (dealer possessing marijuana without tax stamp).

*The district court suppression hearing*

Schooler moved to suppress the marijuana and other evidence seized in the search, arguing delays in calling for the driver's license and vehicle plate checks resulted from questioning unrelated to the stop and were unsupported by reasonable suspicion. He claimed the deputy, in effect, conceded he lacked reasonable suspicion to detain him when he told Schooler he was "good to go."

The State countered that travel plan inquiries as a generic category do not extend a traffic stop. It also argued the deputy was permitted to follow up on inconsistent or implausible answers because Schooler's story was questionable from the outset, so the officer had a duty to verify the rental vehicle's lawful possession and resolve the inconsistencies. The State contended Schooler's "bizarre story" was enough to detain him for the dog sniff and argued there was reasonable suspicion because Schooler lied about his criminal history.

At the district court's suppression hearing, Stopper was the only witness. He testified he had worked for the Geary County Sheriff's Department for more than seven

9

years. Two years before that he was a Junction City police officer. The State did not specifically claim Stopper had specialized training in drug interdiction.

The deputy testified he reviewed Schooler's documents, entered information into his mobile data terminal, provided information to dispatch, and "engaged [Schooler] in general conversation" about his travel plans. On cross-examination, Stopper said he was looking even more into the rental agreement because "the story . . . just did not make sense." He was "very suspicious" of Schooler's claim he got a California vehicle rental in Kansas City. The deputy also doubted the "insurance company rented a vehicle for him in Kansas City for a trip that he had already planned."

The deputy explained that while talking to Schooler he was continuing to check the rental agreement and Schooler's driver's license, name, and date of birth. He explained he needed to call dispatch to confirm the computer report received on his mobile data terminal because Schooler denied being on probation. On cross-examination, the deputy agreed he already had that information on his onboard computer but was confirming it through dispatch because "[t]hey see a lot more returns from wanted individuals and stuff like that than I do." This explanation went unchallenged.

Stopper said he calculated Schooler's supervised release period would be 15 years, which suggested to him that "it was probably more than just a little bit of cocaine." And the deputy testified he suspected more than just a traffic violation from the outset because he could smell air freshener "[i]mmediately upon reaching the passenger side of the truck," which was "odd coming from a rental vehicle." He explained it was

> "extremely rare to actually encounter a rental vehicle that somebody has put air freshener into. I know the rental companies don't actually leave air fresheners in there, and they

10

don't put them in there. They'll clean them and make them smell nice, but they won't leave an air freshener in there that's going to smell that much for that amount of time."

This was important to Stopper because he "had numerous cases where subjects have used air fresheners to conceal the odor of drugs[,]" "[s]pecifically in rental vehicles." He also "noticed numerous cell phones" in the truck, and that "it's common for smugglers of drugs to actually utilize numerous cell phones while conducting their business." He retrieved three cell phones from the truck cabin after the dog alerted according to the traffic stop video. He described one as a "burner." The deputy also explained that as he approached the vehicle from the passenger side, he

> "noticed an extremely large duffle bag sitting on the back seat that, based on my experience with dealing with people that fly different places for short amounts of time, they're generally not going to take a huge duffle bag that takes up the entire back seat with them on a flight, along with numerous amounts of other luggage that were in the vehicle as far as backpacks and boxes and stuff like that."

Stopper also noted he first requested a drug sniffing dog "probably after getting back to [the] patrol vehicle after meeting with [Schooler] at his." At another point in his testimony, the deputy summarized the circumstances leading him to detain Schooler as:

> "The odor of air freshener coming out of the rental vehicle. The large duffle bag on the back seat. The multiple cell phones. His lying about his travel plans. His lying about his criminal history. And his criminal history. They all played into my decision that there was criminal activity present."

He explained he asked Schooler for permission to search the vehicle once he advised him he was being detained because it would speed up the process since there

11

were difficulties locating an available dog. But he also said had a dog not been available, he was prepared to request a search warrant based on the information he had at this point.

The State admitted the traffic stop audio/video recording as an exhibit, as well as several photographs taken during and after the vehicle search. One photograph shows the completely full duffle bag and other backpacks and a large box and debris in the back seat and front passenger area.

*The district court decision*

In a written ruling, the district court ordered all evidence of illegal contraband suppressed. It set out factual findings in 10 numbered paragraphs, noting the officer was suspicious of criminal activity shortly after beginning the stop when he received Schooler's driver's license and rental agreement. The court found Stopper questioned Schooler for nearly 18 minutes before advising him he was "good to go." The court then held:

> "This [traffic stop's] mission was over the second Stopper advised Schooler he was free to leave, 11-12 minutes prior to the drug dog's arrival. Further, this mission would have been completed for an additional several minutes prior to the drug dog arriving had Lt. Stopper been diligent in his records check."

The court concluded:

> "In this case, there is no question that the duration of the traffic stop was extended, in fact, multiple times. Lt. Stopper delayed the initial call to dispatch, delayed the secondary information for dispatch, and delayed the stop for the dog sniff after the Defendant was told he was free to leave. Police action that extends the traffic stop in any measurable amount is unlawful.

12

"Here, the Defendant was stopped by Lieutenant Stopper for a minor traffic infraction that was never actually addressed. Stopper did not immediately call in the Defendant's driver's license and waited over six minutes from the initial contact to do so. Further, the Deputy delayed nearly fourteen minutes before calling in the obstructed tag. Stopper began writing a warning citation nearly seventeen minutes into the stop, and finally advised the Defendant he was free to leave approximately eighteen minutes in to the stop."

The court reached these additional conclusions: (1) the deputy exceeded the encounter's scope at the outset without facts to establish a reasonable suspicion of other crimes, which rendered the resulting detention unreasonable; (2) Schooler's responses would not give a reasonable officer any further reasonable suspicion to detain him; (3) the deputy "conceded" there was no reasonable suspicion to detain Schooler after issuing a warning ticket and advising he was free to leave; and (4) the deputy had no reasonable suspicion to detain Schooler while waiting for the drug dog.

*The Court of Appeals decision*

The State filed a timely interlocutory appeal. See K.S.A. 2017 Supp. 22-3603; *State v. Newman*, 235 Kan. 29, 34, 680 P.2d 257 (1984) (noting suppression must substantially impair the State's case to pursue interlocutory appeal). It argued the district court erred because: (1) the questions about Schooler's travel plans did not unlawfully extend the stop; (2) Stopper had reasonable suspicion to detain him based on the circumstances identified at the suppression hearing; (3) the deputy's reasonable suspicion was not "[p]urged" by Stopper telling Schooler he was "good to go"; and (4) the wait for the drug dog was reasonable.

The panel affirmed, reasoning that "[a]t the very least, once . . . Stopper issued the warning ticket, he needed reasonable suspicion other than the reason for the initial stop in

order to extend the encounter to allow the drug dog to come to the scene." *Schooler*, 2017 WL 2212102, at *6. The panel explained:

> "[W]e cannot replace our judgment for that of the district court regarding factual issues so long as they are supported by substantial competent evidence. Moreover, we are not to reweigh the evidence or to determine credibility. *Based on our review of the record, we find substantial evidence to support the district court's finding that there was no articulated reasonable suspicion to extend the stop after the warning ticket had been issued*. Furthermore, we find as a matter of law that absent such a reasonable suspicion, the extension of the traffic stop in order to conduct a dog sniff violated the Constitution's protection against unreasonable seizures." (Emphasis added.) 2017 WL 2212102, at *6 (citing *Rodriguez,* 135 S. Ct. at 1612).

The panel agreed it was proper for the deputy "to briefly inquire about a driver's travel plans as part of a traffic stop." 2017 WL 2212102, at *5. But it did not decide whether the stop became unreasonable at any time before Stopper issued the warning ticket. It said only that the stop's overall duration was

> "not unreasonable per se, this amount of time to check Schooler's driver's license, to determine if he had any outstanding warrants, to look at the rental documents, and to give him a warning ticket for the snow on his license plate—that could have likely been brushed away within a matter of seconds—is at least questionable." 2017 WL 2212102, at *5.

The State petitioned us to review the panel's decision, which we granted. Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

14

The State contends the panel erred by failing to address whether the deputy had reasonable suspicion to extend the traffic stop under the totality of the circumstances. Traffic stops are seizures under the Fourth Amendment and are subject to its limitations. *Whren v. United States*, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996); *City of Atwood v. Pianalto*, 301 Kan. 1008, 1011, 350 P.3d 1048 (2015).

There is no challenge to the initial stop, so we consider it lawful. We are concerned only with whether the stop became an illegal seizure as it evolved. This turns on whether the deputy measurably extended the stop without reasonable suspicion of other criminal activity. *Rodriguez,* 135 S. Ct. at 1615; see also *Pianalto*, 301 Kan. at 1011 (to comply with Fourth Amendment, officer conducting stop must have reasonable suspicion detainee has committed, is committing, or is about to commit a crime).

*Standard of review*

Faced with a motion to suppress evidence, the State bears the burden of proving a lawful search and seizure. K.S.A. 22-3216(2); *State v. Gray*, 306 Kan. 1287, 1302, 403 P.3d 1220 (2017). The State tries to meet its burden by defending the deputy's questioning as necessary follow up because of: (1) the driver's conflicting and implausible responses; (2) the developing information the deputy obtained that progressively raised his suspicions; and (3) the overlap with recognized tasks attendant to a routine traffic stop. As to the trial court's decision,

> "'an appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard. The ultimate legal conclusion drawn from those facts is reviewed de novo. . . . Substantial evidence refers to evidence that a reasonable person could accept as being adequate to support a conclusion. . . . This court does not reweigh

15

the evidence, assess the credibility of the witnesses, or resolve evidentiary conflicts. [Citations omitted.]' *State v. Mattox*, 305 Kan. 1015, 1035, 390 P.3d 514 (2017)." *State v. Brown*, 306 Kan. 1145, 1151, 401 P.3d 611 (2017).

The essential facts are not in dispute and are verified by the audio/video recording. The district court expressed no credibility determinations about the deputy's suppression hearing testimony, which paralleled the recording.

The district court's dual rulings—that the deputy did not diligently complete the stop and lacked reasonable suspicion to extend it after issuing the warning ticket—make our inquiry more complex than in *Jimenez*, which involved whether travel plan questioning during a traffic stop is categorically justified. *Jimenez*, slip op. at 10.

For Schooler's case, we must scrutinize:  (1) the deputy's progressive inquiry and its relationship to any extension of the stop; and (2) whether the deputy had reasonable suspicion to extend the stop once he detained Schooler to wait for the dog sniff. The State's failure to justify the stop at either juncture will render the seizure unconstitutional. And because the facts are not disputed, we assess both as questions of law. *State v. Sharp*, 305 Kan. 1076, 1081, 390 P.3d 542 (2017) (holding whether reasonable suspicion exists is a question of law; legal conclusion as to its existence is reviewed de novo and underlying factual findings are reviewed for substantial competent evidence).

*The deputy's progressive questioning did not impermissibly extend the stop*

In *Jimenez*, we described Fourth Amendment jurisprudence relating to traffic stops—particularly given *Rodriguez* and its progeny, which this court had not explored before. Neither the panel nor the district court had the benefit of that decision, but it guides the analysis. The *Jimenez* court noted a routine traffic stop is a seizure under the

Fourth Amendment, more analogous to an investigative detention than a custodial arrest. This means courts treat a traffic stop, whether based on reasonable suspicion or probable cause, under the longstanding limitations set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), for nonconsensual police-citizen contacts. *Jimenez*, slip op. at 11.

In *Rodriguez*, the United States Supreme Court explained that beyond simply deciding whether to issue a traffic ticket, an officer's "mission" during such stops typically includes ordinary inquiries to (1) check the driver's license; (2) determine whether there are outstanding warrants against the driver; and (3) inspect the vehicle's registration and proof of insurance. *Rodriguez*, 135 S. Ct. at 1615. The officer also may take "negligibly burdensome precautions" to complete the stop safely. 135 S. Ct. at 1616. But "[o]n-scene investigation into other crimes," the Court stated, "detours from that mission."135 S. Ct. at 1616 ("Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular.").

The *Jimenez* court concluded *Rodriguez* "means that during a stop an officer may not conduct nonconsensual inquiries unrelated to the mission in a way that prolongs the stop—without the reasonable suspicion ordinarily demanded to justify detaining an individual." *Jimenez*, slip op. at 12. But it also noted "these limitations do not mean police perform their duties with a blind eye." Slip op. at 13. In *State v. Morlock*, 289 Kan. 980, 996, 218 P.3d 801 (2009), the court made this same point:

> "An officer is not required to disregard information which may lead him or her to suspect independent criminal activity during a traffic stop. *When 'the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions*.'" (Emphasis added.)

17

As to general travel plan questioning, the *Jimenez* court rejected the State's argument that such questions were simply routine occurrences in a traffic stop that never require independent suspicion to justify an officer in measurably extending a detention to ask them. *Jimenez*, slip op. at 20. It stated:

"[A] plain reading [of *Rodriguez*] shows the Court's intention to clarify that any traffic stop extension without reasonable suspicion or consent—by even a *de minimis* length of time—amounts to an unreasonable seizure when the delay is based on anything but the articulated components of the stop's mission. *Rodriguez*, 135 S. Ct. at 1615. *Noticeably, travel plan questioning is not on the Court's enumerated short list of things to do—even though travel inquiries were made during the stop under study in* Rodriguez." (Emphasis added.) Slip op. at 15-16.

With that in mind, the *Jimenez* court concluded "*Rodriguez* does not envision unbridled travel plan questioning as a staple of traffic stop inquiries. *Circumstances will dictate whether and to what extent such questions are part of the mission*." (Emphasis added.) Slip op. at 16. It then emphasized the need to examine closely how a traffic stop unfolds:

"To be clear, we are not suggesting *Rodriguez* and its progeny instruct that all travel plan questioning will be outside an officer's traffic stop mission. The circumstances will determine that. Such inquiries would be within a particular stop's mission if it were shown they 'serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.' *Rodriguez*, 135 S. Ct. at 1615. For example, and without prejudging specific scenarios, consider when a vehicle is noticed veering off the roadside. Asking how long the driver has been behind the wheel reasonably could be seen as exploring fatigue issues, which relates to the initial infraction and safe vehicle operation. Similarly, asking whether the driver is under the influence could be related to that same infraction. In both instances, the responses may explain the erratic driving and might arguably be related to the officer's decision 'whether to issue a

18

traffic ticket . . . .' 135 S. Ct. at 1615. But such inquiry would be much harder to justify when the stop is 'for a loud muffler, a burned-out license plate light, or a just-ended parking violation.' 4 Search & Seizure § 9.3(d)." *Jimenez*, slip op. at 18-19.

Schooler's stop exemplifies the illustrations above. Travel plan questioning in his case would not be seen as—nor is it claimed to be—relevant to a traffic infraction for a license tag obscured by snow. But see *State v. Lowery*, (No. 116,637, this day decided), slip op. at 9 (noting some travel plan inquiries are appropriate when infraction is driving too close to vehicle in front). Despite this, we conclude Deputy Stopper's questioning did not impermissibly extend the stop because the questioning occurred concurrently with the tasks the deputy was performing to complete the stop and was justified by discrepancies between Schooler's story and the rental agreement.

Stopper's initial questioning about where Schooler was going to and coming from coincided with the request at the passenger side window for his driver's license and vehicle registration. The documents Schooler produced showed the vehicle was a rental from California due back at the same location in a few days. And the panel noted, it was not improper for the deputy to inquire briefly about travel plans during this traffic stop. *Schooler*, 2017 WL 2212102, at *5. Moreover, a noticeable disconnect between the driver's explanations and the vehicle documentation available on the scene warranted additional inquiries. See *Jimenez*, slip op. at 13 (noting law enforcement suspicions aroused by detainee's responses and circumstances may be satisfied by further inquiry); *Morlock*, 289 Kan. at 996.

The deputy testified during his initial contact he almost immediately became suspicious of other criminal activity. He noticed air freshener odor coming from the rental vehicle; observed multiple cell phones, the large duffle bag, and other items and debris in the passenger compartment; and could not reconcile Schooler's explanations

19

with the vehicle rental arrangement. He texted for a drug dog after this first exchange, which the panel agreed was appropriate, assuming the dog's involvement would not extend the traffic stop. 2017 WL 2212102, at *5.

There is no suggestion it was improper for the pair to return to the patrol vehicle to process the driver's license and vehicle information. And once inside the vehicle, the audio recording reflects the deputy's further questioning about Schooler's travel and the truck rental simultaneously occurred as the deputy used his mobile data terminal. The remaining conversation followed up on the responses received from Schooler and the replies the deputy got from the records checks over his mobile terminal and the radio.

The district court made limited factual findings about the events leading up to Schooler issuing the warning ticket. It simply found:

> "4. Lieutenant Stopper explained the reason for the stop to the Defendant, and both parties eventually ended up in Stopper's vehicle. During this time, Lieutenant Stopper indicated that he began conducting his 'enforcement action.'

> "5. While conducting the 'enforcement action' for the Defendant's partially obstructed license plate, Lieutenant Stopper began to interrogate the Defendant about his travel plans, rental vehicle and past criminal history.

> "6. After nearly 18 minutes of 'enforcement action' for the partially obstructed license plate, the Defendant was issued Notice to Appear #58123 and informed that he was 'good to go.'"

The district court's legal conclusions appear to encompass these earlier events:

> "In this case, there is no question that the duration of the traffic stop was extended, in fact multiple times. Lt. Stopper delayed the initial call to dispatch, delayed the secondary

20

information for dispatch, and delayed the stop for the dog sniff after the Defendant was told he was free to leave. Police action that extends the traffic stop in any measurable amount is unlawful.

> "Here, the Defendant was stopped by Lieutenant Stopper for a minor traffic infraction that was never actually addressed. Stopper did not immediately call in the Defendant's driver's license and waited over six minutes from the initial contact to do so. Further, the Deputy delayed nearly fourteen minutes before calling in the obstructed tag. Stopper began writing a warning citation nearly seventeen minutes into the stop, and finally advised the Defendant he was free to leave approximately eighteen minutes in to the stop."

To the extent there are additional factual findings not listed in the numbered paragraphs implicitly embedded within the district court's legal conclusions, they are not supported by the recording or the deputy's testimony—the only evidence from the suppression hearing. It is undisputed the deputy used his mobile data terminal to enter the driver's license and vehicle information shortly after getting inside his patrol car. He had responsive information back six minutes into the stop and that information conflicted with Schooler's story. This inconsistency appropriately spurred additional inquiry. And while it is true the deputy did not "call in" to dispatch until a few minutes later, as the district court found, Stopper explained he had already used his mobile data terminal for that and was radioing dispatch only for additional verification because of the discrepancies he noticed.

Dispatch, the deputy explained, could access more information than was available through his mobile terminal. This explanation was not challenged by Schooler or the district court, and no adverse credibility determination was made detracting from the deputy's testimony. To be sure, there are circumstances in our caselaw supporting a finding that an officer was deliberately stalling. See, e.g., *State v. Wendler*, 47 Kan. App.

21

2d 182, 190-92, 274 P.3d 30 (2012) (holding evidence supported conclusion officer was intentionally delaying, noting long periods when officer did nothing). But we do not see support for such a finding in the record before us.

Similarly, the panel did not analyze this early in-vehicle timeframe other than an aside that its duration was possibly "questionable" but not unreasonable per se. *Schooler*, 2017 WL 2212102, at *5. It is difficult to make anything from that. See *Jimenez*, slip op. at 21-22 (expressing concern panel's comment about reasonableness of the stop's length was "alluding to a standard expressly rejected by *Rodriguez*, i.e., a rule-of-thumb approach, under which the time taken . . . is compared to what would be 'ordinary' for a similar encounter").

Importantly, neither lower court considered whether there was overlap in the deputy's inquiries with the tasks required to complete the stop's mission. See *Jimenez*, slip op. at 15 ("This suggests officers engaging in traffic stops in *Rodriguez*' wake must be attentive to how and when they conduct what may be viewed as unrelated inquiries. They must be especially careful to ensure nonconsensual inquiries occur concurrently with the tasks permitted for such stops so that they will not measurably extend the time it would otherwise take. We would more simply describe this today as multitasking.").

We hold that up to the time the deputy advised Schooler of his detention, the deputy did not impermissibly extend the traffic stop's duration. The recordings show the deputy was continuously engaged with Schooler as the officer processed the traffic stop while trying to satisfy his suspicions about the conflicts in what he was observing and being told.

*Reasonable suspicion at the time of detention*

The district court's decision and the panel's affirmation of it focus on the moment the deputy advised Schooler he was being detained. And there is no question the traffic stop was measurably extended from that point while waiting for the drug dog, so the legal question is whether the deputy had reasonable suspicion to detain Schooler at this time.

There are two points to consider. The first is whether there is a factual or legal consequence to the deputy telling Schooler he was "good to go," when in fact Stopper intended to continue to detain him. The second is whether under the totality of the circumstances, Stopper had reasonable suspicion of other criminal activity to wait for the dog.

As to the first, the district court held, "[L]ieutenant Stopper *effectively conceded* that he did not have reasonable articulable suspicion to detain Mr. Schooler by issuing him a warning and advising him that he was free to leave." (Emphasis added.) But the district court cited no authority that such a statement serves as a binding admission on what is a legal conclusion. See *State v. Young*, 228 Kan. 355, 614 P.2d 441 (1980) ("It is only agreements and admissions of fact which are within the authority of the parties litigant or their attorneys. A court may not be bound by agreements and admissions of the parties as to matters of law or legal conclusions."). Similarly, the panel hinted there was some legal significance to the deputy telling Schooler he was "good to go." *Schooler*, 2017 WL 2212102, at *6 ("[I]t is hard to justify the continued questioning and detention of Schooler. This is especially true because Lieutenant Stopper went so far as to tell Schooler that he was free to go."). But these suggestions are contrary to the caselaw.

To be clear, the question is not whether the deputy tricked Schooler into voluntarily consenting to a vehicle search or extending the detention by saying "good to

23

go." Schooler gave no consent. We reserve that analysis for another day. Instead, we must decide whether the "good to go" statement is somehow legally relevant in deciding if the deputy had an objectively reasonable suspicion that Schooler was engaged in criminal activity other than the traffic infraction.

As to that, the answer is "no" because our inquiry is limited to whether the facts the deputy knew supported further detention. *United States v. Williams*, 271 F.3d 1262, 1271 (10th Cir. 2001) (holding officer telling motorist he was free to leave did not affect determination of whether the officer had reasonable suspicion for later detention because "[a]lthough the record indicate[d] that the officer subjectively intended that the [motorist] was free to go, the relevant inquiry . . . is based on the objective facts known to the officer, not upon the officer's subjective state of mind"); see also *United States v. McHugh*, 639 F.3d 1250, 1258 (10th Cir. 2011) (rejecting argument that officer lacked reasonable suspicion to conduct *Terry* stop based on officer's admission that he had no reason at time of stop to think defendant had committed a crime, because "[t]he detaining officer's '"subjective beliefs and intentions" are, quite simply, irrelevant'" in assessing reasonableness of officer's actions); cf. *Heien v. North Carolina*, 574 U.S. ___, 135 S. Ct. 530, 539, 190 L. Ed. 2d 475 (2014) (holding reasonable suspicion may be based on officer's reasonable mistake of law, but mistake must be objectively reasonable, since courts do not examine officers' subjective understanding); *Whren*, 517 U.S. at 812-13 (foreclosing "any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"; noting the Court had "never held, outside the context of inventory search or administrative inspection . . . that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment"); *State v. Johnson*, 293 Kan. 1, 5, 259 P.3d 719 (2011) ("Seizures are generally permissible if '"an objective officer would have a reasonable and articulable suspicion that the detainee committed, is about to commit, or is committing a crime."'").

24

Reasonable suspicion is "'"a particularized and objective basis" for suspecting the person stopped of criminal activity.'" *State v. DeMarco*, 263 Kan. 727, 735, 952 P.2d 1276 (1998). "Something more than an unparticularized suspicion or hunch must be articulated." 263 Kan. at 735. It is a lower standard than probable cause. "What is reasonable depends on the totality of circumstances in the view of a trained law enforcement officer." *State v. Martinez*, 296 Kan. 482, 487, 293 P.3d 718 (2013). The totality of the circumstances standard "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). A reviewing court must give "due weight" to the factual inferences drawn by both the district court and law enforcement officers. *Ornelas v. United States*, 517 U.S. 690, 699, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996).

The totality of the circumstances standard does not envision a reviewing court pigeonholing each factor as to innocent or suspicious appearances. Instead, the court determines whether all the circumstances justify the detention.

> "'The relevant inquiry is not whether particular conduct is "innocent" or "guilty," but whether a sufficient degree of suspicion attaches to particular types of noncriminal acts. [Citation omitted.] The totality of the circumstances standard precludes a "divide-and-conquer analysis" under which factors that are "readily susceptible to an innocent explanation [are] entitled to 'no weight.'" [Citations omitted.]'" *Sharp*, 305 Kan. at 1081-82.

At the same time, while the standard does not permit officers or the courts to selectively choose the facts that would establish reasonable suspicion, it recognizes "events and conditions giving rise to reasonable suspicion are fluid rather than fixed, and the existence of reasonable suspicion may change once new facts are observed by or become known to law enforcement." *Sharp*, 305 Kan. at 1085.

25

The State argues Stopper had reasonable suspicion to detain Schooler based on: (1) the air freshener odor; (2) the multiple cell phones; (3) Schooler's vague, evasive, and inconsistent statements about his travel plans and criminal history; and (4) his actual criminal history.

Air freshener odor in a rented vehicle has been held to contribute to reasonable suspicion because of its known use for masking drug odor. *United States v. Foley*, 206 F.3d 802, 804, 806 (8th Cir. 2000) (trooper testified this was suspicious and that air fresheners were frequently used to mask the drug odor; record revealed "sufficient articulable facts, including the presence of a masking odor, [driver's] nervous behavior, [driver's] inability to recall the name of his purported daughter-in-law, and the vast divergence between his and [passenger's] allegations regarding travel accommodations . . . to sustain reasonable suspicion"); see also *United States v. Lyons*, 510 F.3d 1225 (2007) (10th Cir. 2010) (concluding totality of circumstances, including officer's belief he smelled air freshener, provided reasonable suspicion to extend traffic stop).

Similarly, Kansas caselaw recognizes:

"[A] 'masking agent,' despite having legitimate retail purposes, may also be used to conceal drugs and certainly may be considered in the reasonable suspicion calculus. *United States v. West*, 219 F.3d 1171, 1178-79 (10th Cir. 2000). The weight assigned to the odor, however, varies with the circumstances. *State v. Malone*, 274 Wis. 2d 540, 683 N.W.2d 1 (2004)." *State v. Moore*, 283 Kan. 344, 358, 154 P.3d 1 (2007).

The *Moore* court did not explain how the circumstances affect the factor's weight. But it cited a Wisconsin case, *Malone*, 274 Wis. 2d 540, in which the court found seven or eight air fresheners in a car occupied by three young men raised suspicion and justified

26

reasonable inquiry. In the other case cited, *West*, the court noted the "Tenth Circuit has consistently held that the scent of air freshener is properly considered as a factor in the probable cause analysis." 219 F.3d at 1179 (holding officer had probable cause to search car trunk when he detected smells of methamphetamine and air freshener, driver was extremely nervous during encounter, and driver had prior criminal record for serious offenses).

"Discrepancies in travel plans or histories have been used as objective reasonable suspicion factors in other cases, depending on the nature of the discrepancy. 'As with unusual travel plans, inconsistencies in information provided to the officer during the traffic stop may give rise to reasonable suspicion of criminal activity.'" *DeMarco*, 263 Kan. at 739. Discrepancies that arouse suspicion include "an individual's internally inconsistent statements [and] the inconsistencies between a passenger and driver's statements regarding travel plans." *United States v. Davis*, 636 F.3d 1281, 1291 (10th Cir. 2011).

The Tenth Circuit has distinguished merely unusual travel plans, which do not contribute to reasonable suspicion, and "bizarre, inconsistent and evasive" ones, which do. *United States v. Simpson*, 609 F.3d 1140, 1151 (10th Cir. 2010). The court explained the distinction:

> "We have credited inconsistent travel plans as a factor contributing to reasonable suspicion when there are lies or inconsistencies in the detainee's description of them. For example, a police officer could reasonably believe a travel plan was implausible—and the person was lying—if that person claimed that he or she had left a certain city by car an hour ago if the officer pulled over that person, 200 miles from the city. To this extent, the factor seems noncontroversial: lies, evasions or inconsistencies about any subject while being detained may contribute to reasonable suspicion. In contrast, this circuit has been reluctant to deem travel plans implausible—and hence a factor supporting reasonable

27

suspicion—where the plan is simply unusual or strange because it indicates a choice that the typical person, or the officer, would not make." *Simpson*, 609 F.3d at 1148-49.

Compare *Simpson,* 609 F.3d at 1152-53 (travel plans contributed to reasonable suspicion when defendant claimed he drove from Nebraska to Reno, Nevada, just to spend one night there playing "21" at his friend's house, but despite the trip's great length and short duration, the defendant could not say when he left and when he planned to return), and *United States v. Santos*, 403 F.3d 1120 (10th Cir. 2005) (travel plans suggested criminal activity when driver [1] gave the officer multiple versions about the length of his intended stay at his destination, [2] was inconsistent about details such as whether a person he intended to visit was his sister or half-sister, and [3] was unable to recall his mother's telephone number or the ages of his sister's children, because confusion about details often indicates story is being fabricated), with *United States v. Wood*, 106 F.3d 942, 944 (10th Cir. 1997) (travel plans did not suggest criminal activity when unemployed driver [1] claimed to be on six-week vacation; [2] told officer he rented car in San Francisco instead of Sacramento, but corrected mistake when confronted with it; and [3] despite rental agreement reflecting car due back in Sacramento, explained that rental company was aware of his plans to use car for one-way travel).

Criminal history alone cannot support reasonable suspicion. "But in conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus. . . . Moreover, when the individual lies about having a criminal history, the inference of wrongdoing is all the more powerful." *Santos*, 403 F.3d at 1132-33 (reasoning that a driver's denial that he had a prior criminal record, when in fact he had a criminal history for drugs, was "the most powerful reason the district court offered for sustaining the finding of reasonable suspicion"); see also *United States v. McRae*, 81 F.3d 1528 (10th Cir. 1996) (reasoning defendant's untruthful answer to whether he had

28

criminal record contributed to articulable suspicion permitting officer to inquire after traffic stop whether defendant was carrying contraband and seek permission to search the car). Schooler, of course, gave inaccurate and incomplete responses about his criminal history.

The recording shows the deputy located three cell phones, which he observed at the stop's outset. Possessing multiple cell phones is relevant, but of questionable weight. In *United States v. Vaughan*, 700 F.3d 705, 712 (4th Cir. 2012), there were four phones in a car containing two people, at least two "of the pre-paid type known to the detaining officer to be associated with narcotics trafficking." The Fourth Circuit held "the presence of the phones constitute[d] a valid factor in a reasonable suspicion analysis." 700 F.3d at 712. But in *United States v. Townsend*, 305 F.3d 537, 544 (6th Cir. 2002), there were "three cellular telephones in the passenger compartment" and the officers claimed the presence of multiple phones "was typical of drug couriers." The Sixth Circuit reasoned,

> "Three cell phones in one car does seem slightly odd, and we are certainly not prepared to hold that the presence of several cell phones cannot contribute to reasonable suspicion . . . . This factor, however, is weak and is not accompanied in this case by more substantially suspicious factors." 305 F.3d at 544-45 (holding no reasonable suspicion despite several "relatively minor" factors recognized as valid considerations in forming reasonable suspicion, including: dubious travel plans based on defendant's uncertainty about destination-family-member's address; multiple cell phones; Bible in vehicle, said to be used to deflect suspicion; and use of third-party vehicle belonging to defendant's mother and for which defendant was an insured driver).

We hold that when the deputy advised Schooler he was being detained, there was objectively reasonable suspicion of other criminal activity to extend the detention for the dog sniff. At that point, in addition to the air freshener, multiple cell phones, and discrepancies with the rental document, Schooler gave evasive answers to questions

29

about his travel plans, suggesting he was making the details up as the conversation went along. More importantly, he gave ambiguous, if not false, answers to questions about his criminal history involving narcotics, suggesting he was trying to downplay or deflect Stopper's attention from the facts.

Based on these circumstances, the deputy had an objectively reasonable, articulable suspicion of wrongdoing to justify the detention for the dog sniff. The lower courts erred in reaching the contrary conclusion.

Reversed and remanded.

* * *

ROSEN, J., concurring: I concur with the majority's reasoning and conclusion. I write separately to express my doubt that the Fourth or Fifth Amendments to the United States Constitution permit law enforcement officers to dangle liberty in front of someone like a carrot in an attempt to secure justification for the violation of individual constitutional rights. I agree that the deputy's statement that Schooler was "good to go" is not legally relevant to the reasonable suspicion analysis in this case, since the suspicion was fully present before the deputy told Schooler he could leave. I also agree that the issue of whether any consent or confession was voluntary is a question for another day because the statement did not elicit either of those from Schooler. However, there should be no doubt that constitutional concerns arise when a detained traveler on the roadway is purposely misinformed that the basis for the detention is no longer in place and as a result the traveler is free to leave.

"You are free to go," or anything resembling it, is a special and significant declaration. It informs a person that his or her right to freedom is once again fully intact.

30

When used as an investigatory ploy, it undermines the significance of the liberty interest it is intended to effectuate. This is especially true when the agent of the government entrusted with the power to detain is the one proclaiming the detention is no longer in force. Deputy Justin Stopper's investigatory tactics here are a threat to the integrity of an individual's right to be free from unreasonable search or seizure and the privilege against compelled self-incrimination. The specific technique of telling Schooler he was free to leave when he had no intention of letting Schooler depart reeks of fraud or coercion. Coercion is a benchmark for interactions requiring *Miranda* protections—interactions showcasing "inherently compelling pressures . . . which work to undermine the individual's will to resist . . . ." See *Berkemer v. McCarty*, 468 U.S. 420, 433, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) (holding that "persons temporarily detained pursuant to [ordinary traffic] stops are not 'in custody'" for *Miranda* purposes because such stops are "noncoercive"); *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). I cannot join the majority without expressing my suspicion that, in the absence of those procedural protections, the deputy's investigatory tactic may have been constitutionally impermissible. Had that method provoked consent or a confession, or had it served as the impetus for reasonable suspicion, I suspect that Schooler's suppression motion would likely have resulted in a different outcome. Thus, while I concur with the majority's decision in this case, I would caution our law enforcement officers against using the promise of freedom in any attempt to circumvent the protections afforded by our Constitution.

BEIER and JOHNSON, JJ., join the foregoing concurrence.